IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA 99 MAR -1 PM 3: 47
SOUTHERN DIVISION

U.S. DISTRICT COURT
N.D. OF ALABAMA

GEORGETTE PATTERSON, ET AL.,    )
                                )
        Plaintiff,              )
                                )
v.                              )  CIVIL ACTION NO. 96-PWG-2944-S
                                )
JEFFERSON COUNTY, ET AL.,       )
                                )
        Defendants.             )              ENTERED
                                )
                 MEMORANDUM OPINION            MAR  1  1999

On or about November 13, 1996 plaintiffs Georgette Patterson and Shelia Gurley filed

a complaint against Jefferson County, Alabama; the Jefferson County Sheriff; Deputy Robert Phillips;

and unknown deputy sheriffs. The complaint was subsequently amended to add as defendants

Captain Earl Patterson; Jim Woodward, Sheriff of Jefferson County; the estate of Mel Bailey, former

sheriff of Jefferson County (now deceased); and Deputies Laura Hull and Debra Brown.[1] The

plaintiffs' complaint claimed that the defendants had violated the plaintiffs' rights, privileges and

immunities as secured them by the Fourth and Fourteenth Amendments to the Constitution of the

---

[1]     On December 15, 1998 counsel for defendants filed a suggestion of death (document #75) stating that
defendant Mel Bailey died on August 29, 1997. On December 14, 1998, one day earlier, counsel for plaintiffs
filed an "amendment and substitution of parties" seeking to substitute the estate of Mel Bailey for defendant
Bailey. (Document #77). The "amendment" was construed as a request to amend and substitute and was
provisionally granted, allowing defendants to file objections. (Document #78). On January 5, 1999
defendants filed a motion to dismiss (document #80) alleging that plaintiff was aware of defendant Bailey's
death by virtue of pleadings and an order of this court filed October 1, 1997, December 9, 1997, June 18, 1998
and June 24, 1998. Defendants argue that plaintiffs' failure to move for substitution within ninety (90) days
or by August 24, 1998 at the latest, is fatal to plaintiff's claims against Bailey and now his estate. Because
formal suggestion of death was not filed until December 15, 1998, the amendment and substitution was
timely. *See Grandbouche v. Lovell*, 913 F.2d 835 (10th Cir. 1990). The motion to dismiss (document #80)
is DENIED.

        In a response (document #81), defendants also represent that the estate of Mel Bailey is not a suable entity
because the estate was closed on July 29, 1998. This argument is persuasive; however, even assuming the
estate is subject to suit, the estate is due to be dismissed for the reasons discussed below.

87

United States, through 42 U.S.C. § 1983. Each plaintiff alleges that she was subjected to unreasonable strip searches at the Jefferson County Jail pursuant to the Jefferson County Jail's Strip Search Policy promulgated on November 2, 1994 and in effect at the time of their searches. Plaintiffs maintain that the policy is unconstitutional. Plaintiff Gurley further alleges that she was "offensively searched" on the side of River Road by defendant Phillips. Plaintiffs also alleged state law claims against all defendants for invasion of privacy and outrageous conduct. (Document #1). Plaintiffs have further alleged state law claims against defendants Hull and Brown for assault and battery, negligence and wantonness. (Document #27).

Defendants have filed several motions for summary judgment. (Documents #41, 42, 43, 44, 65, 67, 69). Summary judgment may be granted only if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Rule 56, *Federal Rules of Civil Procedure*. In making that assessment, the court must view the evidence in a light most favorable to the non-moving party and must draw all reasonable inferences against the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). The burden of proof is upon the moving party to establish his prima facie entitlement to summary judgment by showing the absence of genuine issues and that he is due to prevail as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991). Once that initial burden has been carried, however, the non-moving party may not merely rest upon his pleading, but must come forward with evidence supporting each essential element of his claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Barfield v. Brierton*, 883 F.2d 923 (11th Cir. 1989). Unless the plaintiff, who carries the ultimate burden of proving his action, is able to show some evidence with respect to each element

2

of his claim, all other issues of fact become immaterial and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

## I.        Undisputed Facts as to Plaintiff Patterson

On the evening of March 1, 1996 plaintiff Patterson quit her job at Food World. She took $400 from the cash register. Her manager called her later that night. The manager told her to bring the money back and nothing would happen. When she went back to the store, Ms. Patterson was arrested by the Homewood City Police for theft of property. She was arrested shortly after midnight on March 2, 1996 and held in the Homewood City Jail until March 4, 1996. She was not searched while being held at the Homewood City Jail.

On March 4, 1996 plaintiff Patterson was transported from the Homewood City Jail to the Jefferson County Jail. As part of the intake process at the Jefferson County Jail she was visually strip searched by a deputy she described as female, tall, slim, Caucasian, and blond. Plaintiff Patterson testified in her deposition that she did not know the name of the officer at the time of the search but that her attorney later told her that the deputy was defendant Deputy Laura Hull. Plaintiff further testified that a female, Caucasian officer took her to a holding cell and that a different female, Caucasian officer performed the search. Plaintiff does not remember the names of any of the officers that transported, questioned, booked, or examined her.

Defendant Hull conducted a visual strip search of plaintiff. The search was conducted in a cell located at the far end of a hall, away from other jail personnel and activities. Across the hall from this "holding area" is a wall. The cell had a restroom. The door had a narrow vertical window. The door to the holding cell where the strip search occurred was closed and locked. Plaintiff was

3

given a pat down search outside her clothing prior to the strip search but she was not touched during the course of the strip search. Plaintiff was asked to remove all of her clothes, including her undergarments. Each article of clothing was thoroughly searched and then put to the side. Plaintiff was asked to turn around and raise her arms so the deputy could see if she was hiding any contraband under her arms. She was then asked to face the wall and squat so that the deputy could visually observe whether any contraband was being hidden in plaintiff's body cavities. After she squatted down, Deputy Hull groaned "Hum, that's nice."

After the search was completed, the plaintiff was instructed to get dressed and Deputy Hull left the holding cell. Plaintiff remained in the holding cell for approximately thirty more minutes before being released on bail.

## II.     Undisputed Facts as to Plaintiff Sheila Gurley

On January 28, 1996 at 1:22 a.m. plaintiff Shelia Gurley was stopped by Deputy Robert E. Phillips, a deputy sheriff in the Jefferson County Sheriff's Department. Ultimately, both plaintiff and her husband, who was following plaintiff in a separate vehicle, were arrested by Deputy Phillips and charged with numerous offenses. Plaintiff Gurley was charged with driving under the influence, driving on the wrong side of the road, driving with vision obscured, driving without a seat belt and resisting arrest. In response to defendant Phillips's request of plaintiff's husband for weapons, plaintiff's husband handed defendant Phillips a pocket knife with three or four inch blades.

Phillips instructed plaintiff Gurley to place her hands on the hood of her car and spread her legs apart in order to conduct a search of her person. Phillips performed the search by patting down Gurley's shoulders, arms and waist. Next he untucked her flannel shirt, put his hands under

4

the shirt, and proceeded to pat down her rib cage, moving upwards and back around over the outside of her bra. Without reaching inside any pockets, Phillips patted down Gurley's hip area, her outer thighs, her inner thighs, her "vagina area" and all the way down her leg to her ankles. Gurley never removed any article of clothing nor did Phillips ever ask her to remove any clothing during the pat down search. Other than the rib and chest area, Phillips patted down the remainder of Gurley's person without any actual skin contact with Mrs. Gurley.

Following her arrest, the plaintiff Gurley was transported to the Jefferson County Jail in Birmingham. Once at the jail, the plaintiff was processed into the jail by booking and intake deputies on the first floor of the jail. During the course of the intake process, the plaintiff was given an intoxilizer breath test, the result of which revealed that the plaintiff had a 0.16 blood alcohol content. Her jewelry was also taken and plaintiff Gurley signed the identification card acknowledging what jewelry was taken.

As part of the plaintiff Gurley's intake process into the Jefferson County Jail she was visually strip searched by Deputy Laura Hull and a deputy identified in an amendment to the complaint as defendant Deputy Debra Brown. The plaintiff, in her deposition, identified Debra Brown as a white female with blond hair. By her affidavit Deputy Brown has testified that she is a black female. The identification card prepared when Gurley was processed into the Jefferson County Jail shows that the booking deputy who processed the plaintiff into the jail was "JOR" and that the "search deputy" was "LCH."

Defendant Hull conducted a visual strip search of the plaintiff in a restroom which was located down a hall away from other jail personnel and activities in an area reserved as a "holding area" for female prisoners. The door to the room where plaintiff Gurley was searched was not closed

5

the search; however, plaintiff Gurley did not recall anyone passing by the doorway or entering the room during the search. Male inmates are not placed in or allowed in the area of the jail where the search occurred. Male jail personnel are not permitted in the search area unless there is an emergency situation.

Deputy Hull did not touch plaintiff Gurley during the search, nor did she make any comments to or about her. Plaintiff Gurley was asked to remove all of her clothing, including her undergarments. Her clothing was throughly searched. She was asked to raise her arms in case she might be hiding any contraband under her arms. She also was asked to open her mouth so that the deputies could determine whether any contraband was in the plaintiff's mouth. Plaintiff Gurley was then asked to squat and to spread her vagina and her buttocks. After the search was completed, plaintiff Gurley was allowed to put back on her underpants, her shirt, her pants and her socks. The searching deputies kept her bra, shoes and belt. They also brought plaintiff Gurley some slippers to replace her shoes. After plaintiff Gurley put her clothing back on, she was taken upstairs into the main area of the jail where she was housed in a cell for the remainder of the morning hours of January 28, 1996. She was released that afternoon.

## III. Motion for Summary Judgment by Jefferson County With Respect to § 1983 Claim

Plaintiffs seek to hold Jefferson County responsible for the strip searches which occurred pursuant to the jail's strip search policy. Plaintiffs argue that the county cannot insulate itself from liability for constitutional violations occurring in the performance of its obligations under law by assigning the authority to perform those objections to state officials or by labeling local officials state officials and then defining the duties of those officials under state law. In *Turquitt v. Jefferson County, Alabama*, 137 F.3d 1285 (11th Cir. 1998), *cert. denied*, ___ U.S. ___, 119 S.Ct.

6

174 (1998), the Court of Appeals for the Eleventh Circuit specifically held that Jefferson County was not a proper defendant in a § 1983 action for injuries arising from the sheriff's management of the jail. The court reviewed Alabama law and concluded that "Alabama sheriffs act as state officers when supervising inmates and otherwise operating the county jails." The court further recognized that under Alabama law the counties are responsible for erecting and maintaining the physical plant of the jail through funding but the sheriff is responsible for the daily operation of the jails and supervision of the inmates. The court specifically overruled *Parker v. Williams*, 862 F.2d 1471 (11th Cir. 1989) and its progeny "insofar as they held that Alabama sheriffs in their daily operation of county jails act as policymakers for the county." 137 F.3d at 1291. The strip search policy clearly involves the daily operation of the jail over which the county has no control. Jefferson County is, therefore, entitled to summary judgment on authority of *Turquitt*.

IV. Motion for Summary Judgment of Defendant Debra Brown

In the amended complaint both plaintiffs alleged that defendants Hull and Brown

> strip searched them, or authorized the strip search of them, or ordered the strip search of them, or improperly trained the persons who did the strip search, or failed to stop the strip search of them, or knew there was wide spread strip searching going on in violation of the Constitution of the United States and failed to stop it, all in violation of their 4th Amendment rights to be free from unreasonable searches and seizures and in violation of state law.

(Document #27).

Plaintiff Patterson testified in her deposition that she was strip searched by defendant Hull. Plaintiff Patterson did not identify defendant Brown as being involved in strip searching her.

7

Defendant Brown is therefore entitled to summary judgment with respect to all claims made against her by plaintiff Patterson.

In her deposition, plaintiff Gurley testified that she was strip searched by defendant Hull and "a little short blond headed woman." (Exhibit 1 to document #57, Gurley's affidavit). Further, in her deposition testimony, plaintiff Gurley was questioned concerning defendant Brown:

> Q:   Describe Ms. Brown, or Deputy Brown, if you can?
>
> A:   She's sort of short, bigger than me. She's got blond hair.
>
> Q:   And it was blond hair?
>
> A:   Uh-huh.
>
> Q:   White lady or black lady?
>
> A:   White lady.

(Exhibit B to Document #412, Gurley deposition, p.64).

The Jefferson County Identification Card prepared on plaintiff Gurley indicates that the booking deputy was "JOR" and the search deputy was "LCH." (Exhibit A to Document #42). Defendant Brown submitted an affidavit stating that she could not have been one of the deputies who searched plaintiff because "I am a black female. I do not have blonde hair." She also stated that the entries "Booking Dep. JOR/Search Dep LCH" indicate that the booking deputy was John O. Robbins, a white male, and the search deputy was Laura Hull, a white female. (Affidavit to Document #42).

The only basis that plaintiff Gurley has for opposing the granting of summary judgment in favor of defendant Brown is that defendant Hull testified in her deposition that she and Deputy Brown strip searched plaintiff Gurley, Exhibit A to document #41 at 16-17, and that "defendant has stated in answers to interrogatories that Debra Brown was the booking officer at the time of the

8

search." (See Document #58 at 7). The Jefferson County Jail identification card prepared on plaintiff Gurley reflects that the booking deputy was "JOR." In light of the identification card which clearly does not implicate Brown and, further, in light of plaintiff Gurley's insistence that the second deputy was a white female with blond hair, the court concludes that there is no genuine issue of material fact concerning defendant Brown's participation in the search of plaintiff Gurley. Defendant Brown is entitled to summary judgment with respect to all claims made against her by plaintiff Gurley.

V.     Motion for summary judgment by defendants Estate of Bailey, Woodward and Patterson in their individual capacities with respect to constitutionality of strip search policy

Plaintiffs allege that the Jefferson County sheriffs are liable for the alleged constitutional violation resulting from the strip search policy because it was through the policy of the sheriff that the constitutional wrongs occurred. (Documents #1 and #27). Plaintiffs further allege that defendant Patterson is the author of the strip search policy at issue here. (Document #18).

Plaintiff Gurley argues that the policy is unconstitutional because Officer Hull testified that every inmate who is reported to have a weapon is strip searched and that such an automatic strip search policy is contrary to the balancing test of *Justice v. Peachtree City*, 961 F.2d 188 (11th Cir. 1992). (See Document #58 at 16). Defendant Patterson also alleges that the policy that requires an automatic strip search of all people charged with felonies is contrary to the balancing test of *Peachtree City*. (Plaintiff's brief received July 17, 1998). Patterson and Gurley both complain that the policy allows female prisoners to be stripped in open view to male officers. (Document #58, p.17 and plaintiffs' brief received July 17, 1998).

9

The strip search policy promulgated by defendant Patterson on November 2, 1994

while Bailey was sheriff and in effect at the time that both plaintiffs were strip searched provided:

> A determination must be made for each new arrestee
> regarding the need for a strip search. For all new
> commitments, a very thorough frisk search should be
> conducted immediately upon the subject being brought
> to jail.
>
> The factors to be considered when making the
> determination to strip search are those that would
> cause a reasonable suspicion that a detainee is carrying
> or concealing contraband. These factors may be based
> on such things as the nature of the offense, the
> arrestee's appearance and conduct, and any past arrest
> record. Consider two basic categories:
>
> Strip search is required for:
> (A) All sentenced inmates, all State inmates, all
> persons arrested on felony charges, and all persons
> charged with crimes of violence, contraband offenses
> or controlled substance offenses.
>
> (B) Any arrestee when there is reasonable suspicion
> that he/she is carrying or concealing contraband.

(Exhibit C to Exhibit C to Document #69).

This policy replaced the previous policy requiring strip searches of all newly committed prisoners.

(Exhibit B to Exhibit C to Document #69). Defendant Patterson described the extent of the searches

that were performed from 1994 through February 1995 when he was Chief Correctional Officer:

> The subject was escorted to a holding area which is
> out of sight from other persons in the Jail's booking
> area. The subject then would be directed to open his
> or her mouth and raise his or her tongue. A visual
> inspection of the subject's mouth was then conducted
> by a deputy. The subject was then directed to undress,
> down to his or her undergarments. The subject's
> clothing would be inspected for contraband. The

10

subject would then be directed to remove his or her
undergarments. At that time, a visual inspection of the
subject's groin (for male arrestees) or vagina (for
female arrestees) and rectum was conducted at a
distance of at least six feet. The deputy would ask the
subject to spread his or her buttocks and to bend at the
waist to allow the deputy to inspect the rectum area.
Once this visual search was completed, the subject was
directed to get dressed.

All strip searches under this policy were conducted by
deputies of the same sex as the subject. Female
deputies were not allowed to search male inmates, and
male deputies were not allowed to search female
inmates.

At no time did the inspecting deputy make contact
with an arrestee's "exposed" body. The "strip search"
was a visual inspection of the inmate's body in an
effort to detect any contraband that might have been
hidden in areas undetected during an initial "pat-
down" search or frisk.    If the searching deputy
developed reasonable suspicion that contraband might
be located in an arrestee's body cavity, the deputy was
directed to notify other personnel.    Body cavity
searches were conducted only by the Jail's medical
staff, or else the inmate would be taken to Cooper
Green Hospital for such an intrusive search.

(Exhibit C to Document #69).

Appendix No. 5 of the Jefferson County Jail's Operations Manual detailed the manner in which the

strip searches were to be performed:

> **Under no circumstances is a deputy or any employee of the
> Jefferson County Jail's staff permitted to conduct or witness a
> strip search of an inmate of the opposite sex.** [Emphasis in
> original.].
>
> The following actions shall be observed:
> 1.    Instruct the inmate to remove his clothes, place clothing on a table or counter
>       and move out of reach of the clothing.

2.      Instruct the inmate to stand erect, feet apart, with arms extended outward, hands open, then visually inspect for contraband in his:

    A.    Hair,
    B.    Ears, mouth and nose,
    C.    Arms, armpits and hands,
    D.    Groin,
    E.    Sole and toes on feet,
    F.    Rectum (instruct the inmate to turn around, bend over and spread his buttocks),
    G.    Remove any bandages carefully. Inspect and replace with new ones.

3.      Instruct the inmate to remove any artificial devices (such as false teeth and artificial limbs) and visually inspect for contraband.

4.      If the inmate may be wearing a plaster cast and the deputy suspects that contraband is concealed in the cast, the cast may be removed, inspected, and replaced by medical personnel.

5.      When the body search is completed, instruct the inmate to stand erect, feet apart, hands on top of head and move out of reach to inspect his clothing.

6.      Check for presence of contraband in clothing. Extreme caution should be exercised by the officer to avoid being cut by a concealed sharp instrument while inspecting:

    A.    Pockets,
    B.    Linings,
    C.    Fly, waistband, cuffs, seams, collars, hat band,
    D.    Inside of all garments,
    E.    Soles, heels and insides of shoes,
    F.    Socks (inside and outside).

(Exhibit D to Exhibit C to Document #69).

In an affidavit, defendant Patterson explained the justification for authorizing strip searches:

> The justification for authorizing strip searches of "sentenced inmates" or "state inmates", *i.e.*, inmates transported from state prisons, is that such inmates, when brought in from other prisons, may have had access to contraband which access would be unknown to officials in the Jefferson County Jail. Laundries,

12

kitchens, machine shops and other departments in state penitentiaries are often accessible to these convicts and contraband (especially weapons) often can be obtained (or fabricated) in such areas. "Felony suspects" were included in the strip search authorization since many such persons are repeat offenders who attempt to bring contraband into a correctional facility because they know its value to other inmates. Also, felony arrestees may still be carrying evidence (e.g., drugs, weapons) on their bodies at the time of their incarceration. For these reasons, a thorough search of felony arrestees was deemed necessary to prevent such contraband from reaching the inmate population. While a cursory search for weapons and contraband might have been conducted in the field by an arresting officer, it is possible that many items may be concealed on an arrestee's person in a manner that will not be detected during a cursory search or "pat down." In order to ensure that contraband would not enter the Jail. I deemed it necessary to cause a more thorough search of a felony arrestee to be made at the time of his or her booking.

(Exhibit C to Document #69).

Defendant Patterson further stated that strip searches have resulted in the discovery of numerous items of contraband, including narcotics, knives and other items that might not have been discovered by a pat down search. (Exhibit C to Document #69).

The affidavits and exhibits submitted by defendant Patterson establish that prior to November 2, 1994 the jail's policy was to strip search all newly committed prisoners. On November 2, 1994 the jail modified its policy to require strip searches of all sentenced inmates, state inmates, felony arrestees and all persons charged with crimes of violence, contraband offense or controlled substance offenses. The new policy further required strip searches of all arrestees when there was a reasonable suspicion that the person was carrying or concealing contraband.

13

Under the policy, a strip search was required of plaintiff Patterson because she was

arrested on felony charges, specifically theft of property. Under the policy, a strip search could have

been required of plaintiff Gurley, who was charged only with misdemeanors, only if there was a

reasonable suspicion that she was carrying or concealing contraband.

Defendants argue that they are entitled to qualified immunity. In *Jenkins by Hall v.*

*Talladega City Board of Education*, 115 F.3d 821, 823 (11th Cir. 1997), *cert. denied*, ___ U. S. ___,

118 S.Ct. 412, 139 L.Ed.2d (1997), the Court of Appeals for the Eleventh Circuit clearly and

concisely summarized the principles of qualified immunity which guide this court in determining

defendants' entitlement to qualified immunity:

> "Qualified immunity protects government officials
> performing discretionary functions from civil trials
> (and the other burdens of litigation, including
> discovery) and from liability if their conduct violates
> no 'clearly established statutory or constitutional rights
> of which a reasonable person would have known.'
> *Lassiter [v. Alabama A & M University]*, 28 F.3d
> [1146] at 1149 [(11th Cir. 1994) (en banc)] (quoting
> *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct.
> 2727, 2738, 73 L.Ed.2d 396 (1982)). "For the law to
> be clearly established to the point that qualified
> immunity does not apply, the law must have earlier
> been developed in such a concrete and factually
> defined context to make it obvious to all reasonable
> government actors, in the defendant's place, that
> 'what he is doing' violates federal law." *Id.* (citing
> *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct.
> 3034, 3039, 97 L.Ed.2d 523 (1987)). "For qualified
> immunity to be surrendered, pre-existing law must
> dictate, that is, truly compel (not just suggest or allow
> or raise a question about), the conclusion for every
> like-situated, reasonable government agent that what

14

> defendant is doing violates federal law *in the circumstances.*" *Lassiter*, 29 F.3d at 1150.

115 F.3d at 823. The court further noted:

> In this circuit, the law can be "clearly established" for qualified immunity purposes only by decisions of the U.S. Supreme Court, Eleventh Circuit Court of Appeals, or the highest court of the state where the case arose. *Hamilton v. Cannon*, 80 F.3d 1525, 1532 n.7 (11th Cir. 1996) (citing *Courson v. McMillian*, 939 F.2d 1479, 1497-98 & n.32 ( 11th Cir. 1991)).

115 F.3d at 826, n.4.

The question before this court in considering whether defendants are entitled to qualified immunity is whether on January 28 and March 4, 1996, the dates of the relevant conduct, the law was clearly established such that reasonable officials responsible for promulgating search policies standing in defendants' place reasonably should have known that a policy requiring strip searches of all felony arrestees and of misdemeanor arrestees when there was a reasonable suspicion that the arrestee was carrying or concealing contraband violated the Fourth Amendment.

The parties correctly agree that the decisions which reflect the clearly established law in 1996 are *Bell v. Wolfish*, 441 U.S. 520 (1971) and *Justice v. Peachtree City*, 961 F.2d 188 (11th Cir. 1992).

In *Bell v. Wolfish*, the United States Supreme Court upheld the policy of a federal detention facility which required a visual body cavity strip search of both male and female pretrial detainees after every contact visit with a person from outside the institution. The court concluded

15

that the searches did not violate the Fourth Amendment because the searches were not unreasonable.

441 U.S. at 558. The court recognized:

> The test of reasonableness under the Fourth
> Amendment is not capable of precise definition or
> mechanical application. In each case it requires a
> balancing of the need for the particular search against
> the invasion of personal rights that the search entails.
> Courts must consider the scope of the particular
> intrusion, the manner in which it is conducted, the
> justification for initiating it, and the place in which it is
> conducted.

441 U.S. at 559.

    In *Peachtree City*, the Court of Appeals for the Eleventh Circuit expounded on the

*Bell* balancing test:

> The *Bell* balancing test for reasonableness requires "at
> a minimum, that the facts upon which an intrusion is
> based be capable of measurement against 'an objective
> standard,' whether this be probable cause or a less
> stringent test."

961 F.2d at 192.

    In this case the policy required strip searches for all felony arrestees and for

misdemeanor arrestees if there is a reasonable suspicion that the arrestee is carrying or concealing

contraband. While recognizing that "a strip search represents a serious intrusion upon personal

rights," the *Peachtree City* court also recognized that "strip searches are valuable law enforcement

tools in maintaining security and locating contraband in institutions." 961 F.2d at 192-93. This court

likewise recognizes these truths. In looking to the manner in which the searches are to be conducted,

the policy at issue in this case clearly provides that the searches are to be conducted and witnessed

16

only by members of the same sex, the searches occur in an area out of sight from other persons and is limited to a visual, as opposed to digital, body cavity search.

Finally, as to the justification for the strip search policy, defendant Patterson stated that the strip searches were necessary to prevent contraband (especially weapons) from reaching the inmate population. The courts in both *Peachtree City* and *Bell* acknowledged that a jail holding cell is a place "fraught with serious security dangers."

While all felony arrestees are strip searched pursuant to the jail's policy, the justification for such searches is that many felony suspects are repeat offenders and know the value of contraband to other inmates and that felony arrestees may carry evidence on their bodies at the time of their arrest and incarceration.

Further, the policy specifically required reasonable suspicion in order to justify a strip search of a misdemeanor arrestee based on factors such as the nature of the offense, the arrestee's appearance and conduct and any past arrest record. The challenged policy satisfied both the *Bell* balancing test and the *Peachtree City* considerations.[2]

---

[2] The Middle District of Alabama recently decided a similar strip search policy in *Magill v. Lee County*, 990 F. Supp. 1382 (M.D. Ala. 1988), *affirmed without published opinion*, No. 98-6144, ___ F.3d ___ (11th Cir. Sept. 30, 1998). In *Magill*, one of the female plaintiffs was strip searched (down to her underwear) after being arrested for driving under the influence while the other female plaintiff was strip searched (naked) while awaiting release on bond on bad check charges. Both women were strip searched pursuant to a policy which requires a strip search of everyone who is put into a cell at the Lee County Jail. The court in *Magill* suggested that *Peachtree City* required a "reasonable suspicion" for the search only because that case involved a juvenile and the *Magill* court concluded that "[s]earches of all newly-admitted detainees who are going to be locked up and in contact with other prisoners, are justified" based on security concerns. The court further concluded that the searches were reasonable in scope and noted that "[t]he constitutional balancing of inmate's rights and jail's concerns does not turn on the issue of whether the inmates are allowed to wear a bra and panties." 990 F. Supp. at 1390. This court agrees with the *Magill* reasoning. Where a strip search is performed pursuant to and in conformity with a policy, a separate balancing test is not required for each plaintiff but rather only for the policy which has been followed. Although *Peachtree City* required a specific balancing test analysis with respect to the plaintiff, the strip search was apparently not pursuant to a policy.

17

The court concludes that defendants Estate of Bailey, Woodward and Patterson are entitled to qualified immunity with respect to the constitutionality of the policy. The court alternatively concludes that based on the foregoing, the policy is not unconstitutional.

Further, these defendants can not be liable for any actions of defendant Hull in applying the policy as the theory of *respondeat superior* is inapplicable in § 1983 actions. *Monell v. Department of Social Services*, 436 U.S. 658 (1978). Moreover, there is no allegation that these defendants failed to properly train defendant Hull.

VI.     Motion for Summary Judgment by Defendant Hull with
        respect to the strip searches of plaintiffs Patterson and Gurley

There is no allegation by plaintiff Patterson against defendant Hull that defendant Hull failed to follow the policy of the Jefferson County Jail in performing the strip search of plaintiff Patterson, who was charged with a felony. The court acknowledges that the alleged comment by defendant Hull "Hum, that's nice" was offensive; however, the comment, without more, did not violate Patterson's constitutional rights. Defendant Hull is entitled to summary judgment with respect to plaintiff Patterson's Fourth Amendment claim.

Plaintiff Gurley argues that defendant Hull did not have had a reasonable suspicion to justify her search of plaintiff. Deputy Hull has testified that she believed she had reasonable individualized suspicion to justify her search of the plaintiff early on the morning of January 28, 1996 for the following reasons:

>       (1)     Deputy Hull received information first from the Sheriff's Department radio dispatcher and, ultimately, directly from the arresting officer, Robert Phillips, that the

18

plaintiff and/or her co-arrestee, Mr. Gurley, had been arrested for crimes which included driving under the influence and resisting arrest.

(2)     Deputy Hull was advised by the dispatcher and by Deputy Phillips that both the plaintiff and her co-arrestee, Mr. Gurley, had a knife on their persons at the time of their arrests.

(3)     Deputy Hull also was aware that the plaintiff had resisted the deputy's attempt to arrest her, and that either the plaintiff or her co-arrestee had attacked the arresting deputy. Also, one of the co-arrestees had tried to take the deputy's gun from him and one of such co-arrestees had escaped from a lawful arrest.

(4)     The plaintiff was loud, boisterous, disruptive and argumentative once she was brought into the Jefferson County Jail. She even cursed on at least one occasion. She had a blood alcohol reading of 0.16.

(Exhibit A to document #41 at 21-25).

Deputy Hull also testified that she strip searches every inmate who is reported to have a weapon on his or her person. (Exhibit A to document #41 at 22).

Plaintiff Gurley argued that defendant Hull did not have a reasonable suspicion to justify the search because defendant Hull did not have the information she claimed to have. In her affidavit, plaintiff Gurley stated

> Before I got stripped, defendant Phillips was with me the whole time, except for the time he brought Joe in. At no time did I ever hear him tell Laura Hull or anyone else anything about my arrest

. . . .

19

> I did not resist his arrest. I did not attack the officer.
> My husband did not attack the officer. I was not
> extremely intoxicated. I was not belligerent. I
> followed instructions. I was not boisterous. There is
> no way that Deputy Hull could have gotten
> information about me having a knife at the time of my
> arrest. I have never carried a knife. Nobody called the
> dispatcher in my presence or my husband's presence to
> talk about contraband, knives, drugs, weapons, guns,
> or anything else. I was not loud when I came into the
> jail. I was not cursing. I was trying to talk to my
> husband because he was a bloody mess.
>
> The room where I was strip searched was in a hallway
> that was open to the view of anyone who happened
> by, so that I could be seen naked.

(Exhibit 1 to Document #57).

Plaintiff Gurley's husband stated in his affidavit:

> I was with Officer Phillips the entire time that we were
> riding in the car and at no time did I hear him call in
> and tell anyone about what he found or alleges to have
> found on me or my wife or in our trucks or cars during
> the arrest.

Defendant Hull argues that she is entitled to qualified immunity. In *Peachtree City*

a fourteen year old girl was arrested for loitering and truancy and was strip searched (down to her

panties) by two female police officers. Immediately after the strip search, the girl was released into

her mother's custody. Despite the young age of the arrestee, the insignificance of the charges, and

the intrusiveness of the search, the Court of Appeals for the Eleventh Circuit nevertheless upheld the

strip search. In the case before this court, plaintiff Gurley was older than the *Peachtree City* plaintiff,

was charged with more serious charges, was actually placed in a cell and was subjected to only a

20

slightly more intrusive search. The *Peachtree City* court concluded that the officers had a reasonable

suspicion that the girl was hiding contraband on her person based on the following reasons:

> (1) The officers suspected that drinking and drug
> activity regularly occurred in the area in which they
> arrested the juveniles; (2) Matson [arresting officer]
> saw Justice [co-defendant] give Simon something; (3)
> Simon appeared extremely nervous; (4) Dryden
> [juvenile officer] thought that females were more likely
> than males to conceal contraband on their persons; (5)
> Simon had a friend whose mother suspected her
> daughter of using drugs; and (6) Dryden [juvenile
> officer] suspected that Simon might have contraband
> on her person.

*Justice v. City of Peachtree*, 961 F.2d 188, 194 (11th Cir. 1992). The facts in the case before this

court are at least as likely to justify a reasonable suspicion as the facts in *Peachtree City.*

      While defendant denies resisting arrest, the fact remains that she was charged with

resisting arrest. (Exhibit A to Document #42). Further, while she denied she was extremely

intoxicated, she had a blood alcohol content of 0.16. This is twice the level necessary under Alabama

law for a person to be presumed to be under the influence of alcohol. *See Code of Alabama* §32-5A-

191(a)(1) § 32-5A-194(b)(3); *Bruno v. Director of Public Safety*, 673 So.2d 44,5 n.1 (Ala. Civ. App.

1995) (On August 9, 1995 Alabama lowered its blood alcohol level that creates a legal presumption

of intoxication to .08 percent). Plaintiff Gurley's opinion that she "was not extremely intoxicated"

is thus contrary to law. It is also questionable whether plaintiff, based on her blood alcohol level, was

in a position to appreciate whether she was being belligerent, boisterous and loud.

      Without making any credibility determinations concerning plaintiff Gurley's affidavit

testimony, the court concludes that a reasonable deputy standing in defendant Hull's place would

have thought she had reasonable suspicion to warrant a strip search of plaintiff Gurley based upon

the objective facts alone--that is, that plaintiff Gurley was charged with resisting arrest and that her

blood alcohol content was twice the level necessary to be presumed to be under the influence.

Defendant Hull is entitled to qualified immunity and thus summary judgment with respect to the §

1983 claim by plaintiff Gurley.

VII.    Motion for Summary Judgment by Defendant Phillips

Plaintiff Patterson's deposition testimony does not implicate defendant Phillips in any

way. Thus, defendant Phillips is entitled to summary judgment with respect to any claims by plaintiff

Patterson.

Plaintiff Gurley alleged in the complaint that she was arrested for a DUI by defendant

Phillips and "offensively searched on the side of the River Road." In the July 17, 1998 response to

defendants' motion for summary judgment, plaintiff Gurley characterizes her claim against defendant

Phillips as an excessive force case and argues that she was slapped while already restrained in the

back of the patrol car and that she was "fondled in a sexual way" during the pat down search.

Although plaintiff Gurley initially alleged only that she was offensively searched, her subsequent

allegation that she was fondled in a sexual manner could reasonably be considered to be a description

of the extent of the offensiveness of the search. Because the alleged slapping incident occurred after

the "offensive search" was completed, (Exhibit 1 to Document #57), this allegation is not related to

the search claim, and the complaint was not amended to include an excessive force claim.[3] Because

---

[3]      The complaint was filed on November 12, 1996. Plaintiff was allowed until May 16, 1997 to add causes of
action, defenses or parties. (Documents #15 and #24). Plaintiff amended the complaint three times.
(Documents #9, #18 and #27). The Gurley deposition, during which plaintiff mentioned the slapping
incident, was taken on August 20, 1997. On July 17, 1998 plaintiff Gurley first alleged that the actions of
defendant Phillips constituted excessive force in response to defendant Phillips's June 5, 1998 motion for
summary judgment.

22

the complaint was not amended and because defendant Phillips has not acquiesced to conforming the

pleadings to the evidence, the court will not consider the excessive force claim.

Plaintiff Gurley described the search in her deposition as follows:

A:    He patted my shoulders down, my arms down, down my waist. Then he untucked my blouse -- my flannel shirt -- went up under my flannel shirt, went back up the side here up under my arms --

Q:    You're gesturing. When you say, "Your side," you're pointing to the side of your rib cage?

A:    Rib cage. And then back around over my bra and my breasts.

Q:    Anything else?

A:    Then he come down to my front pocket, my back pocket.

Q:    Did he just pat down your front and back pockets or did he reach inside those pockets?

A:    He patted them.

Q:    What else?

A:    He rubbed the outer side of my thighs, and then the inside of my thighs and around my vagina area and then went the rest of the way down my legs.

Q:    When you say your vagina area, are you talking about he was touching that area on the outside of your pants or on the inside of your pants?

A:    Outside of my pants.

Q:    And after he had done that, you said he went on down your legs; is that right?

A:    Yes, sir.

Q:    Still patting down on the outside of your pants; is that right?

A:    He rubbed all the way down my legs.

Q:    On the side of your legs, on the front, on the back, or on all parts of your legs.

23

A:     With both hands, both legs.

Q:     And, again, you made a gesture. You had your hands sort of together as if he circled your legs and went all the way down the thigh to your ankle; is that a fair description?

A:     Yes, sir.

Q:     All right. Is there anything else he did of this search -- any other body parts he touched?

A:     No, sir.

Q:     All right. If I understand your testimony correct, the only time he went inside your outer clothing was when he untucked your flannel shirt and went up the side of your rib cage over the front of your shoulders and down over your breasts; is that right?

A:     Yes, sir.

Q:     And at any point when he was searching under your shirt, is it your testimony that he did anything other than pat you down -- And I guess I'm just going to have to ask you this. Is it your testimony that he fondled your breasts while his hands were there?

A:     Yes, sir, he did.

Q:     Inside your bra or on the outside of your bra?

A:     The outside.

Q:     At any time did Deputy Phillips ask you to remove any of your clothing?

A:     No, sir.

                    . . .

Q:     And did he say anything to your during the time he was conducting the search?

A:     No, sir.

Q:     Did you say anything to him during the time he was conducting the search?

24

A:     Yes, sir.

Q:     What did you say to him?

A:     I asked him why he going up under my shirt.

Q:     And what did he say in response to that?

A:     He said he had to make sure I didn't have nothing on me.

Q:     Was there anything else he said?

A:     No, sir.

Q:     And have you described for us in completed detail as you can the search Deputy Phillips conducted?

A:     Yes, sir.

(pp.39-42).

Significantly, in describing the pat down search, plaintiff Gurley did not choose the word "fondled" to describe the actions of defendant Phillips. Defendant Phillips did not make any comments while searching plaintiff other than to explain why he had to reach up under her shirt. Defendant Phillips reached inside plaintiff's outer clothing only while searching under her flannel shirt and then his hands remained outside of her bra. There was no testimony that the pat search was prolonged in any way or that defendant Phillips focused on any particular part of plaintiff's body during the search. Defendant Phillips argues that he is entitled to summary judgment based on qualified immunity because the search was objectively reasonable and because no case law existed in this Circuit that would have informed defendant Phillips that his pat down search was not reasonable. The description given by plaintiff of the pat down search is a description of a routine pat down search. There is no United States Supreme Court, Eleventh Circuit or Alabama Supreme Court

25

precedent which would indicate that a pat down search of a female becomes unreasonable within the meaning of the Fourth Amendment when performed by a male and when it includes a pat down search of the chest and crotch area. *See Martin v. Swift*, 781 F. Supp. 1250, 1253 (E. D. Mich. 1992) (there is "no question that [the pat-down search of a female arrestee by a male officer would pass constitutional muster"). Defendant Phillips is therefore entitled to qualified immunity and thus summary judgment in his favor with respect to plaintiff Gurley's § 1983 Fourth Amendment claim.

VIII. Section 1983 Claims Against Defendants in their Official Capacities

As sheriffs and deputy sheriffs, all defendants are state executive officers. *Parker v. Amerson*, 519 So.2d 442, 443 (Ala. 1987); *Parker v. Williams*, 862 F.2d 1471, 1475 (11th Cir. 1989). To the extent that they are sued in their official capacities, they are immune from suit in federal court under the Eleventh Amendment to the United States Constitution. *Carr v. City of Florence, Alabama*, 916 F.2d 1521, 1524-27 (11th Cir. 1990). Defendants are therefore entitled to summary judgment with respect to the § 1983 claims made against them in their official capacities.[4/]

IX. State Claims Against Defendants

With respect to the state law claims, all defendants as state executive officers are entitled to state sovereign immunity under Article I, Section 14 of the Alabama Constitution of 1901 which provides "the State of Alabama shall never be made a defendant in any court of law or equity." *McMillian v. Johnson*, 101 F.3d 1363, 1364-65 (11th Cir. 1996); *Tinney v. Shores*, 77 F.3d 378, 383

---

[4/] The court is aware that defendants are not entitled to Eleventh Amendment immunity to the extent that plaintiffs request injunctive relief. *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89 (1984). However, based on this court's alternative holding in Section V that the strip search policy is not unconstitutional, further discussion of the § 1983 claims against defendants is unnecessary.

(11th Cir. 1996). Defendants are therefore entitled to summary judgment with respect to the state law claims against them.

Based on the forgoing, defendants' motions for summary judgment (documents #41, 42, 43, 44, 65, 67, 68) are due to be GRANTED.

A Final Judgment consistent with this memorandum opinion will be filed simultaneously herewith.

DONE this the ⎣ day of March, 1999.

_____

PAUL W. GREENE
UNITED STATES MAGISTRATE JUDGE

27